UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| THOMAS J. DANGER,<br><br>      Plaintiff,<br><br>  v.<br><br>CHRISTOPHER SCHEDLER, *et al.*,<br><br>      Defendants. | Case No. C17-1892-TSZ-MAT<br><br>REPORT AND RECOMMENDATION |

INTRODUCTION AND SUMMARY CONCLUSION

This is a civil rights action brought under 42 U.S.C. § 1983. Plaintiff Thomas Danger alleges in this action that defendants violated his constitutional rights when they used excessive force in effectuating his arrest in August 2017. Plaintiff names as defendants in his complaint City of Lake Stevens police officers Christopher Schedler and Chad Wells. Defendants now move for summary judgment, arguing that the force used against plaintiff was objectively reasonable and therefore did not violate plaintiff's federal constitutional rights. (*See* Dkt. 28.) Plaintiff has been advised of the summary judgment requirements pursuant to *Rand v. Rowland*, 154 F.3d 952 (9th Cir. 1998), but has filed no response to defendants' motion.[1] The Court, having reviewed

---

[1] Defendants note in their summary judgment motion that because plaintiff submitted a complaint and affidavit as a part of his original case filing, and because he signed both under penalty of perjury, the Court may

REPORT AND RECOMMENDATION
PAGE - 1

defendants' motion for summary judgment, and the balance of the record, concludes that defendants' motion should be granted, and that plaintiff's complaint and this action should be dismissed with prejudice.

## BACKGROUND

*A.     Events Preceding Use of Force Incident*

On the night of August 29, 2017, in Lake Stevens, Washington, plaintiff broke into a shed on the property of Scott Hoglund by cutting the lock which secured the structure. (Dkt. 31, ¶ 2.) Mr. Hoglund caught plaintiff in the shed and closed the door on him, attempting to keep plaintiff inside. (*See id.*) Mr. Hoglund then told his wife to call 911, which she did. (*Id.*) Plaintiff forced his way out of the shed and then struggled with Mr. Hoglund as Mr. Hoglund tried to prevent plaintiff from leaving. (*See* Dkt. 12-2 at 22; Dkt. 31, ¶ 3.) As plaintiff ran away, he was reaching into his pocket and throwing things. (*Id.*; Dkt. 31, ¶ 4.) Mr. Hoglund yelled to his neighbor, who happened to be outside, to stop plaintiff. (Dkt. 31, ¶ 4.) The neighbor, Bruce Brill, managed to intercept plaintiff and Mr. Hoglund then joined Mr. Brill to help hold plaintiff until the police arrived. (*Id.*) Plaintiff struggled to get away from Mr. Hoglund and Mr. Brill, but they managed to hold plaintiff until the police got there. (*Id.*, ¶ 5.)

City of Lake Stevens police officers were dispatched to what was identified as a burglary in progress. (*See* Dkt. 12-2 at 22; Dkt. 30, ¶ 3.) The reporting party, Mr. Hoglund's wife, informed dispatch that a man had broken into the shed in their backyard and that the man was fighting with her husband. (*See id.*) Officer Christopher Schedler was the first officer to arrive on the scene. (Dkt. 30, ¶ 3.) When Officer Schedler arrived, he saw plaintiff being detained by two men and he

---

consider these documents as opposing affidavits for purposes of summary judgment. (*See* Dkt. 28 at 1 (citing *Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995)).)

noted that plaintiff was acting aggressively. (*See* Dkt. 12-2 at 22; Dkt. 30, ¶ 3.) Officer Schedler recognized plaintiff from previous contacts, and he knew that plaintiff regularly carried a knife and other sharp implements used to commit burglaries. (Dkt. 30, ¶ 5.) Officer Schedler also knew that plaintiff had substance abuse issues. (*Id.*)

Officer Chad Wells arrived on the scene just after Officer Schedler. (Dkt. 12-2 at 17; Dkt. 29, ¶ 4.) As Officer Wells got out of his vehicle, he saw plaintiff fighting with another man. (*See id.*) Officer Wells recognized plaintiff from numerous previous contacts and, like Officer Schedler, knew that plaintiff typically carried a knife and other sharp implements, and that he used illegal drugs. (*Id.*)

B.   *Defendants' Account of Use of Force Incident*[2]

According to Officer Schedler, once he left his patrol vehicle he took immediate steps to gain control of plaintiff because plaintiff was attempting to pull away from the civilians who were detaining him. (*See* Dkt. 12-2 at 10, 22; Dkt. 30, ¶ 6.) Officer Schedler grabbed plaintiff's left arm, pulled him to the ground, and got him onto his stomach. (*Id.*) Once plaintiff was on the ground, Officer Schedler ordered plaintiff to show his hands, but plaintiff refused. (Dkt. 12-2 at 10, 22; Dkt. 30, ¶ 8.) It was dark at that time, and plaintiff had his hands under his body, causing Officer Schedler concern because he assumed plaintiff had a knife or burglary tools in his pockets or waistband, the area where plaintiff's hands were. (*See id.*)

Officer Wells approached plaintiff and Officer Schedler after plaintiff had been taken to the ground. (Dkt. 12-2 at 10; Dkt. 29, ¶ 7.) Officer Wells observed that plaintiff was struggling with Officer Schedler and was attempting to roll away from him. (Dkt. 29, ¶ 2.) Concerned that

---

[2] Because the parties' versions of events which occurred after officers arrived on the scene differ, the Court will summarize the alleged facts separately.

REPORT AND RECOMMENDATION
PAGE - 3

plaintiff would gain access to a knife, Officer Wells dropped his knee into plaintiff's mid-back in order to pin plaintiff to the ground. (*See* Dkt. 29, ¶ 2; Dkt. 30, ¶ 9.) Pinning plaintiff to the ground gave Officer Schedler the leverage he needed to gain control of plaintiff's right hand. (Dkt. 12-2 at 10, 22; Dkt. 30, ¶ 9.) Officer Wells then tried to gain control of plaintiff's "flailing" left arm. (Dkt. 12-2 at 17; Dkt. 29, ¶8.) Officer Wells ordered plaintiff to stop fighting and put his hand behind his back. (*Id.*) Plaintiff said "No," or something to that effect, and then drove his hand back underneath him and tucked his head down as if to create space for his hand to grab something which Officer Wells feared would be a knife. (*Id.*)

While ordering plaintiff to give him his hand, Officer Wells used his left elbow to strike plaintiff in the shoulder. (*See* Dkt. 12-2 at 18; Dkt. 29, ¶ 9.) This strike was ineffective in getting plaintiff to display his hand, and it appeared to Officer Wells that plaintiff had managed to grab ahold of something underneath him. (*Id.*) Fearing that plaintiff had armed himself, Officer Wells used his right elbow to deliver a quick, moderate, blow to plaintiff's head while ordering plaintiff to stop and give him his hand. (*See id.*; Dkt. 29, ¶ 10.) The impact of the blow seemed to stun plaintiff and Officer Wells grabbed plaintiff's arm and tried to pull it away from his body and towards his back. (*See id.*) Plaintiff then pulled his arm away and reached again towards his chest area. (*See id.*) Believing that plaintiff was attempting to retrieve a weapon, Officer Wells punched him in the head to stop him. (*See id.*) According to Officer Wells, he did not use his full strength in delivering the punch. (Dkt. 29, ¶ 10.)

When the punch to plaintiff's head did not seem to have any effect, Officer Wells prepared to deliver a punch using his full strength to stop plaintiff from being able to arm himself. (Dkt. 12-2 at 18; Dkt. 29, ¶ 11.) Officer Wells warned plaintiff that he was going to strike him again at which point plaintiff stopped actively fighting with the officers, and the officers handcuffed

REPORT AND RECOMMENDATION
PAGE - 4

plaintiff without further resistance. (Dkt. 12-2 at 18; Dkt. 29, ¶ 11.)

### C. Plaintiff's Account of Use of Force Incident

According to plaintiff, while he was being held by the two civilians, Officer Schedler delivered an elbow strike to his jaw and then grabbed his left arm and threw him to the ground, knocking the wind out of him. (Dkt. 12-1, ¶¶ 2, 3.) Once plaintiff was on the ground, Officer Schedler put a knee in plaintiff's ribs, causing them to crack. (*Id.*, ¶ 3.) Plaintiff then felt Officer Wells put a knee in his back, and he was gasping for air and trying to communicate to the officers that he couldn't breathe. (*Id.*) Plaintiff asserts that he also heard his ribs crack when Officer Wells put a knee in his back. (Dkt. 12 at 3.)

Plaintiff states in his affidavit that he then felt two blows to the back of his head, apparently delivered by Officer Wells, after which he claims he "was pretty much out of it." (Dkt. 12-1, ¶¶ 4, 5.) In contrast, plaintiff asserts in his complaint that Officer Wells first hit him with an elbow in the back of his head, and then hit him in the jaw. (*See* Dkt. 12 at 3.) Plaintiff claims in his affidavit that after these first two blows, he felt a harder blow to the back of his head and then a "full power punch" to his jaw, also purportedly delivered by Officer Wells. (Dkt. 12-1, ¶¶ 5, 7.) According to plaintiff, he never offered any resistance. (*Id.*, ¶ 5.)

### D. Events Following Use of Force Incident

After plaintiff was secured in handcuffs, officers helped him sit up and Officer Wells radioed for fire and aid to check on plaintiff. (*See* Dkt. 29, ¶ 12; Dkt. 30, ¶ 10.) Officer Wells noticed a large lump on plaintiff's jaw which appeared to be broken. (Dkt. 29, ¶ 13.) When Officer Wells asked plaintiff about his jaw, and whether he was hurt, plaintiff told him that he had been attacked the night before and punched in the jaw. (*Id.*) According to Officer Wells, plaintiff also told him that his ribs hurt from a previous injury. (Dkt. 29, ¶ 13.) Officer Schedler's narrative

REPORT AND RECOMMENDATION
PAGE - 5

report of the incident states that plaintiff told him his jaw was broken the night before "when he was sucker punched by a juvenile." (*See* Dkt. 12-2 at 6, 23.) Plaintiff states in his affidavit that he never said anything to officers "to give them the impression that some juvenile sucker punched" him. (Dkt. 12-1, ¶ 8.)

Officer Wells conducted a search incident to plaintiff's arrest and removed a wood lathe cutting tool from the left chest pocket of plaintiff's coat, and a wood handled knife from the right chest pocket of plaintiff's coat. (Dkt. 29, ¶ 14.) The metal shank on the lathe tool measured 4-1/2" long, and the blade on the knife measured 3-1/8" long. (*Id.*, ¶ 19.) Officer Wells found in plaintiff's wallet a substance which he believed to be heroin, as well as a driver's license not belonging to plaintiff. (*Id.*, ¶ 15.) Officers also retrieved a container that plaintiff had thrown away while running from the homeowner, which was later confirmed to contain methamphetamine. (*See id.*, ¶¶ 17, 18.)

When aid arrived, plaintiff was evaluated and was then transported by ambulance to Providence Hospital in Everett to be cleared for booking into jail. (Dkt. 29, ¶ 16; Dkt. 30, ¶ 10.) Providence Hospital advised Officer Schedler, via plaintiff's discharge papers, that the injury to plaintiff's jaw was a fracture and would require surgery. (Dkt. 12-2 at 6, 22.) Plaintiff was nonetheless cleared for booking. (*See* Dkt. 30, ¶ 10.) After plaintiff was medically cleared, Officer Schedler advised plaintiff that he was under arrest for first degree burglary and possession of methamphetamine, and plaintiff was transported to the Snohomish County Jail. (Dkt. 30, ¶ 10.)

Plaintiff was prosecuted and ultimately pled guilty to second degree burglary. (*See* Dkt. 33, Ex. A.) Plaintiff was thereafter sentenced to a term of nine months confinement. (*See* Dkt. 33, Ex. B.) Though plaintiff was in custody at the time he filed this action, he has since been released from custody. (*See* Dkts. 1, 26.) Aside from filing a notice of change of address in April

2018, plaintiff has shown little interest in litigating this matter since his release from custody. In a recently filed motion to dismiss, defendants note that plaintiff failed to attend his deposition which had been scheduled for July 5, 2018. (*See* Dkts. 36, 37.) Plaintiff has not responded in any fashion to that motion which argues for dismissal based on plaintiff's failure to appear for his deposition and his general failure to prosecute this action. (*See id*.)

## DISCUSSION

### Summary Judgment Standard

Summary judgment is appropriate when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the initial burden of showing the district court "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. The moving party can carry its initial burden by producing affirmative evidence that negates an essential element of the nonmovant's case, or by establishing that the nonmovant lacks the quantum of evidence needed to satisfy its burden of persuasion at trial. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc*., 210 F.3d 1099, 1102 (9th Cir. 2000). The burden then shifts to the nonmoving party to establish a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must draw all reasonable inferences in favor of the nonmoving party. *Id*. at 585-87.

In supporting a factual position, a party must "cit[e] to particular parts of materials in the record . . .; or show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R.

Civ. P. 56(c)(1). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 585. "[T]he requirement is that there be no *genuine* issue of material fact. . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52.

The opposing party must present significant and probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient[]" to defeat summary judgment. *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Nor can the nonmoving party "defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements." *Hernandez v. Spacelabs Med. Inc*., 343 F.3d 1107, 1112 (9th Cir. 2003).

<u>Section 1983 Standard</u>

In order to sustain a cause of action under 42 U.S.C. § 1983, a plaintiff must show (i) that he suffered a violation of rights protected by the Constitution or created by federal statute, and (ii) that the violation was proximately caused by a person acting under color of state law. *See Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). The causation requirement of § 1983 is satisfied only if a plaintiff demonstrates that a defendant did an affirmative act, participated in another's affirmative act, or omitted to perform an act which he was legally required to do that caused the deprivation complained of. *Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981) (citing

1  *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978)).

2  <u>Excessive Force</u>

3   Plaintiff asserts in his complaint that defendants violated his rights under the Fifth, Eighth and Fourteenth Amendments when they used excessive force against him in effectuating his arrest on August 29, 2017. (Dkt. 12 at 3.)

   The United States Supreme Court has made clear that all claims that law enforcement officers have used excessive force in the course of an arrest must be analyzed under the Fourth Amendment's reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). The Supreme Court explained in *Graham* that "the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id*. at 397 (citation omitted). The Court cautioned that reasonableness must be assessed from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight, and must allow for the fact that "police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397.

   To determine whether the force allegedly used was objectively reasonable, the Court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id*. at 396. In other words, the Court weighs the type and amount of force inflicted against the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, whether the suspect is actively resisting arrest or attempting to evade arrest by flight, and any other relevant factors. *See id*.; *Jackson v. City of Bremerton*, 268 F.3d 646, 651-52 (9th Cir. 2001); *Bryan v. MacPherson*, 630

REPORT AND RECOMMENDATION
PAGE - 9

F.3d 805, 826 (9th Cir. 2010).

   A.   *Nature and Quality of the Intrusion*

Plaintiff alleges that Officer Schedler, in effectuating his arrest, used force against him in the following ways: (1) he struck plaintiff in the jaw with his elbow; (2) he grabbed plaintiff's arm and threw him to the ground; and, (3) he put his knee into plaintiff's ribs. (Dkt. 12-1, ¶ 2.) Plaintiff alleges that while he was being arrested by Officer Schedler, Officer Wells used force against him in the following ways: (1) he placed a knee in plaintiff's back while plaintiff was on the ground; (2) he delivered two blows to the back of plaintiff's head; (3) he delivered a harder blow to the back of plaintiff's head; and, (4) he hit plaintiff in the jaw.[3] (Dkt. 12-1, ¶¶ 3-5.)

Defendants argue in their summary judgment motion that the amount of force allegedly used by the officers in effectuating plaintiff's arrest is properly characterized as minimal. (*See* Dkt. 28 at 9, 11.) However, defendants have submitted in support of their motion a declaration and report from a "police practices expert," Tom Ovens, who explains that striking tactics such as those alleged to have been used in this case constitute an "intermediate force option." (*See* Dkt. 32, Ex. A at 6, ¶ 9.) The Ninth Circuit has explained that intermediate force is "capable of inflicting significant pain and causing serious injury" and therefore "present[s] a significant intrusion upon an individual's liberty interests." *Young v. County of Los Angeles*, 655 F.3d 1156, 1161 (9th Cir. 2011). Defendants' characterization of the amount of force used as minimal, particularly with respect to the strikes by Officer Wells, arguably understates what occurred, even by Officer Wells' own account. The Court concludes that defendants used an intermediate level of force in

---

[3] The facts set forth by plaintiff in his complaint are slightly different than those set forth by plaintiff in his affidavit. In his complaint, plaintiff omits his assertion that Officer Schedler put a knee in his ribs, and he references only two alleged blows by Officer Wells, one to the head and one to the jaw, rather than the four blows referenced in his affidavit. (*See* Dkt. 12 at 3; Dkt. 12-1, ¶¶ 2, 4, 5.)

REPORT AND RECOMMENDATION
PAGE - 10

effectuating plaintiff's arrest.[4]

    *B.    Governmental Interests*

As noted above, the Court evaluates the government's interest in the use of force by evaluating the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officer or others, whether the suspect was actively resisting arrest or attempting to evade arrest, and any other relevant factors.

As to the first factor, the severity of plaintiff's crime, the record reflects that defendants were dispatched to a burglary in progress at an occupied residence. (*See* Dkt. 29, ¶ 3; Dkt. 30, ¶ 3.) Residential burglary is a class B felony in the State of Washington, and is deemed a "serious offense." *See* RCW 9.41.010(3)(a) and 16(a). As the Ninth Circuit has explained, "[t]he government has an undeniable, legitimate interest in apprehending criminal suspects . . . and that interest is even stronger when the criminal is . . . suspected of a felony." *See Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003). This factor clearly favors defendants.

The second factor, whether plaintiff posed an immediate threat to the safety of the officers or others, is the most important of the three specific factors identified in *Graham*. *Bryan*, 630 F.3d at 826 (citing *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005)). The "threat analysis must be based on objective factors and not merely 'a simple statement by an officer that he fears for his safety or the safety of others.'" *Nelson v. City of Davis*, 685 F.3d 867, 880 (9th Cir. 2012) (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001)).

Officers Schedler and Wells both note generally that people who commit property crimes

---

[4] Regardless of how the level of force is characterized, the critical inquiry is whether defendants' actions were reasonable. *See Mattos v. Agarano*, 661 F.3d 433, 443 (9th Cir. 2011) (citing *Scott v. Harris*, 550 U.S. 372, 383 (2007)).

REPORT AND RECOMMENDATION
PAGE - 11

frequently carry knives and other sharp implements to gain access to homes, cars and outbuildings. (*See* Dkt. 29, ¶ 4; Dkt. 30, ¶ 5.) The also both note, more specifically, that they knew plaintiff well, having had numerous prior contacts with him, and they knew that plaintiff regularly carried a knife and other sharp instruments used to commit burglaries. (*Id*.) The officers also knew that plaintiff was in the process of fleeing from just such a burglary when he was apprehended by civilians, and they observed him struggling with the civilians who had detained him. (*See* Dkt. 29, ¶ 4; Dkt. 30, ¶ 4; Dkt. 31, ¶ 5.)

Officer Wells perceived that while plaintiff was on the ground, with his hand underneath him, he was reaching for something which Officer Wells feared could be a knife. (*See* Dkt. 29, ¶ 8.) According to Officer Wells, it also appeared to him at one point that plaintiff had grabbed ahold of something that could have been a weapon. (*See* Dkt. 29, ¶ 9.) Given that plaintiff was unsecured, apparently reaching underneath his body, and was known to carry weapons, Officer Wells could reasonably assume that plaintiff posed an immediate threat to the safety of both officers. The officers' suspicions that plaintiff may be armed with dangerous weapons at the time of his apprehension were obviously borne out by the fact that officers discovered not only a knife, but also a lathe cutting tool on plaintiff's person during a search conducted incident to plaintiff's arrest. This second *Graham* factor weighs heavily in defendants' favor.

The third *Graham* factor is whether plaintiff was actively resisting arrest or attempting to evade arrest by flight. Plaintiff claims that he never offered any resistance to the officers as they effectuated his arrest. (Dkt. 12-1, ¶ 5.) However, prior to their arrival on the scene, officers were advised by dispatch that plaintiff was running away from the scene with the homeowner giving chase, and that plaintiff had fought with the homeowner after the homeowner caught him. (*See* Dkt. 29, ¶ 3; Dkt. 30, ¶ 3.) The officers also reported seeing plaintiff acting aggressively toward

REPORT AND RECOMMENDATION
PAGE - 12

the homeowner and the neighbor who were restraining him when officers arrived, and the homeowner confirms that plaintiff struggled to get away. (*See* Dkt. 29, ¶ 4; Dkt. 30, ¶ 4; Dkt. 31, ¶ 5.) This factor also favors defendants. In sum, all three of the *Graham* factors favor defendants, some more heavily than others.

### C.   Reasonableness of Force Used

The Court now turns to the dispositive question of whether the force applied was reasonably necessary under the circumstances. As discussed above, defendants used an intermediate level of force in effectuating plaintiff's arrest. Viewing the evidence in plaintiff's favor, but from the perspective of a reasonable officer on the scene, the level of force employed was objectively reasonable under the circumstances.

At the time defendants arrived on the scene, plaintiff was being detained by civilians and was struggling against them. Defendant Schedler perceived an immediate need to end the confrontation between plaintiff and the civilians and to gain control of plaintiff. From Officer Schedler's perspective, this need was especially urgent because he knew plaintiff frequently carried a knife. Pulling plaintiff to the ground immediately and forcefully before he could escape, or potentially arm himself, was reasonable under these circumstances.

Officer Wells saw plaintiff "fighting" with one of the civilians when he arrived on the scene and at least perceived plaintiff to be struggling against Officer Schedler. It was therefore reasonable for Officer Wells to drop his knee onto plaintiff's back and pin him to the ground in an effort to gain control of him. And, given that plaintiff was unsecured, with one hand underneath his body and, from Officer Wells' perspective, attempting to grab ahold of something underneath him which could have been a knife, it was reasonable for Officer Wells to deliver the strikes to plaintiff's head to get him to show his hand.

REPORT AND RECOMMENDATION
PAGE - 13

Plaintiff claims he never offered any resistance, but this is a rather conclusory assertion which does not speak to whether plaintiff was actually complying with officers' commands that he produce his hands. Plaintiff contends that when he was pulled to the ground, the wind was knocked out of him, that he was gasping for air, and trying to communicate that he couldn't breathe. He also contends that after receiving the first couple of blows, he "was pretty much out of it." Even assuming plaintiff was not actively resisting officers, it is conceivable under plaintiff's version of events that he may not have understood officers' directives, thereby delaying his compliance with those directives. Until defendants had full control of plaintiff, and had his hands secured, he posed a threat to officers and their attempts to gain control were justified. Defendants are therefore entitled to summary judgment with respect to plaintiff's excessive force claim.

## CONCLUSION

For the foregoing reasons, this Court recommends that defendants' motion for summary judgment be granted and that plaintiff's complaint and this action be dismissed with prejudice. This Court further recommends that defendants' more recently filed motion to dismiss be stricken as moot. A proposed order accompanies this Report and Recommendation.

## DEADLINE FOR OBJECTIONS

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **twenty-one (21) days** of the date on which this Report and Recommendation is signed. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed. Responses to objections may be filed within **fourteen (14) days** after service of objections. If no timely objections are filed, the matter will be ready for consideration by the District Judge on **September 5, 2018**.

REPORT AND RECOMMENDATION
PAGE - 14

DATED this 15th day of August, 2018.

Mary Alice Theiler
United States Magistrate Judge